```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
```

```
DUSTIN ROBERT JONES,            )
                                )
              Plaintiff,         )
                                )
       v.                       )        1:24CV450
                                )
THE CITY OF GREENSBORO and      )
GREENSBORO FIRE DEPARTMENT,     )
                                )
              Defendants.        )
```

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

Plaintiff Dustin Jones is a firefighter who alleges his employment was wrongfully terminated because of his posts to social media. Before the court is the motion of Defendants the City of Greensboro (the "City") and the Greensboro Fire Department ("GFD") to dismiss Jones's first amended complaint (the "complaint"). (Doc. 12.) Jones has filed a response in opposition (Doc. 16), and Defendants have filed a reply (Doc. 19). The court held a hearing on the motion on March 19, 2025. For the reasons that follow, the motion will be granted in part and denied in part.

I.   **BACKGROUND**

The facts alleged in the complaint, including attachments,[1]

---

[1] See E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011) ("In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint.") (citation omitted). No party questions the authenticity of the attachments.

which are viewed in the light most favorable to Jones, show the following:

Jones was a U.S. Navy veteran and decorated captain with over sixteen years' experience at the GFD. (Doc. 11 at 2-3 ¶¶ 5-9). Beginning in 2021, he made several posts to his Facebook page, which resulted in attempts at corrective action by GFD leadership and ultimately his termination:

In 2021, Jones "responded to a structure fire" and "took pictures showing hoarding conditions and posted them" on social media. (Id. at 25.) On March 10, 2021, the "leadership team" "coached" Jones regarding this incident, which directed him to review GFD's social media directive. (Id. at 25-26; id. at 3-4 ¶ 10.)

In November 2022, Jones reposted a Facebook video of Guilford County Sheriff Danny Rogers dancing at a parade, on which Jones commented "[t]his is the clown in charge of keeping you safe. Freaking joke." (Id. at 23, 26.) Sheriff Rogers, who is black, was up for reelection at the time. (Id. at 23.) An anonymous complaint was filed, which led to Jones meeting with Maria Hicks-Few in GFD's administration office. (Id.) According to Jones, he was forced to "basically prove [him]self not to be a racist." (Id.) Jones alleges he was "read the definition of clown and told because black people have been called monkeys and monkeys perform in the circus with clowns that [his] comment was racist." (Id.)

2

In February 2023, following the killing of Tyre Nichols[2] by Memphis police, Jones shared the headline of a related Fox News article and commented "will we see another George Floyd situation." (Id. at 23, 26.) Jones then met with GFD Chief G.J. Robinson, III, who told Jones that someone had taken his post to the Greensboro City Council and asserted Jones was trying to incite a riot. (Id. at 23; id. at 4 ¶ 12.) Robinson told Jones he had spoken with the Greensboro City Attorney and its human resources office, who reportedly "could not find fault in the post"; Robinson nevertheless warned Jones against sharing his political views. (Id. at 4 ¶ 13, 23.) After the meeting, Jones posted, "[t]o those watching me . . . keep watching . . . ." (Id. at 26.)

Jones made other posts prior to his termination. While the dates of these posts are not alleged in the complaint, the attachments to the complaint suggest that they came to the attention of GFD leadership following the February 2023 meeting with Jones. (Doc. 11 at 26.) These include the following:

- "If I've ever offended you, I'm sorry . . . that you're a little bitch." (Id. at 28 (ellipsis in original).)

- "Straight Pride. It's natural, it's worked for thousands of years, and you can make babies." (Id. at 29.)

- "If this is a woman," (superimposed on a picture of Rachel

---

[2] Nichols was a 29-year-old black man fatally shot by Memphis police officers.

Levine, United States Assistant Secretary for Health during the COVID pandemic) "this is a fishing pole" (superimposed on a picture of an assault rifle). (<u>Id.</u> at 30.)

- "You know what's insane . . . A white person can paint their face black and be accused of being a racist. Yet a man can dress as a woman and be called a hero . . . ." (<u>id.</u> at 31) (ellipses in original); accompanying this post was the definition of blackface from Wikipedia. (<u>Id.</u>)

- "I identify as invisible. I'm TRANSparent . . . My pronouns are who/where?" (<u>Id.</u> at 32.)

On May 12, 2023, GFD Chief Robinson fired Jones, concluding that his posts had "become increasingly offensive and discriminatory" and that his conduct was "egregious to the point that it erode[d] public trust and negatively impact[ed] or interfere[d] with the day-to-day operations of the Fire Department." (Doc. 11 at 21.) Jones appealed his firing to the City Manager (<u>id.</u> at 22-24), who upheld the termination (<u>id.</u> at 25-27).

This lawsuit followed. Jones alleges violation of his First Amendment rights pursuant to 42 U.S.C. § 1983 (First Cause of Action); violation of his Free Speech rights under the North Carolina Constitution Article I, Section 4 (Second Cause of Action); violation of North Carolina General Statute § 160A-169 (Third Cause of Action); wrongful discharge in violation of the

4

North Carolina Constitution (Fourth Cause of Action); breach of contract (Fifth Cause of Action); and punitive damages (Sixth Cause of Action). (Doc. 11.) Jones named GFD and the City as Defendants, although he stipulated at the hearing to dismissal of GFD as a party. The City now moves to dismiss all counts of the complaint.

## II. ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. (8)(a)(2). A Rule 12(b)(6) motion to dismiss is meant to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).

5

However, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008) (citation omitted). Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual allegations "to raise a right to relief above the speculative level" so as to "nudge[] . . . the[] claims across the line from conceivable to plausible." Twombly, 550 U.S. at 555, 570; see Iqbal, 556 U.S. at 678. Thus, mere legal conclusions should not be accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

### B. Jones's First Amendment Retaliation Claim

To state a claim under the First Amendment for retaliatory discharge, a plaintiff must plausibly allege facts that satisfy the three-prong test set forth in McVey v. Stacy, 157 F.3d 271 (4th Cir. 1998). Thus, the plaintiff must allege facts showing

> (1) that he was a "public employee . . . speaking as a citizen upon a matter of public concern [rather than] as an employee about a matter of personal interest;" (2) that his "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public;" and (3) that his "speech was a substantial factor in the employer's termination decision."

Grutzmacher v. Howard Cnty., 851 F.3d 332, 342 (4th Cir. 2017) (alteration in original) (quoting and relying on McVey, 157 F.3d at 277-78).

6

As to the first prong, "[s]peech involves a matter of public concern when it involves an issue of social, political, or other interest to a community." _Id._ at 343 (citation omitted). "In determining whether speech addresses matters of public concern," courts "'examine the content, context, and form of the speech at issue in light of the entire record.'" _Id._ (quoting _Urofsky v. Gilmore_, 216 F.3d 401, 406 (4th Cir. 2000) (en banc)). "This public-concern inquiry centers on whether the public or the community is likely to be truly concerned with or interested in the particular expression." _Id._ (quotation marks and citations omitted). Conversely, speech implicating matters of only personal interest does not satisfy the first _McVey_ prong. _See_ _id._ In that vein, personal grievances and complaints about employment conditions do not amount to public-concern speech. _See_ _id._

Whether speech addresses a matter of public concern is a legal determination for the court. _Goldstein v. Chestnut Ridge Volunteer Fire Co._, 218 F.3d 337, 351-52 (4th Cir. 2000). If a plaintiff cannot show his speech was on a matter of public concern, his First Amendment retaliation claim fails "[i]n the absence of unusual circumstances," and the court need not consider the other two _McVey_ prongs. _See_ _Kashdan v. George Mason Univ._, 70 F.4th 694, 703 (4th Cir. 2023) (citation omitted) (dismissing First Amendment claim where the plaintiff could not show his speech was on a matter of public concern).

7

If the plaintiff can show at least some of the speech at issue implicated matters of public concern, the court must determine "whether [the plaintiff's] interest in speaking upon the matters of public concern outweighed [the defendant's] interest in providing effective and efficient services to the public" — the balancing required by Pickering v. Board of Education, 391 U.S. 563 (1968). Grutzmacher, 851 F.3d at 344-45 (alteration adopted) (quoting McVey, 157 F.3d at 277). This second prong is also a question of law for the court. Id. at 345. The public employer does not need to show actual disruption from the speech, "only that an adverse effect was 'reasonably to be apprehended.'" Maciariello v. Sumner, 973 F.2d 295, 300 (4th Cir. 1992) (quoting Jurgensen v. Fairfax Cnty., 745 F.2d 868, 879 (4th Cir. 1984)).

To carry out this balancing, the court considers "the context in which the speech was made, including the employee's role and the extent to which the speech impairs the efficiency of the workplace." Grutzmacher, 851 F.3d at 345 (citation omitted). The Fourth Circuit has identified nine non-exhaustive factors to consider:

> whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution;

8

and (9) abused the authority and public accountability
that the employee's role entailed.

Id. at 345 (quoting Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 317 (4th Cir. 2006)). "[T]his inquiry is fact-intensive and context-specific, and will depend on the arguments the government develops and the evidence it offers." Lawson v. Union Cnty. Clerk of Court, 828 F.3d 239, 252 (4th Cir. 2016). The government bears the burden to justify the adverse employment action on legitimate grounds. Id.

The third prong is not contested by the City. Thus, the court turns to consideration of the first two prongs.

### 1. Whether Jones's Posts Implicate Matters of Public Concern.

The City first argues that Jones's First Amendment retaliation claim should be dismissed because his Facebook posts were not on a matter of public concern. (Doc. 13 at 12-16.) The City offers several reasons why this is so. As to the post about Sheriff Rogers, it notes that speech does not address a matter of public concern simply because it concerns a public official. (Id. at 13 (citing Carey v. Throwe, 957 F.3d 468, 475 (4th Cir. 2020); Doc. 19 at 6.) As to the post about the death of Tyre Nichols, the City asserts that the post should be considered alongside the follow-up warning, "[t]o those watching me . . . keep watching . . . ," and in context merely expresses "'displeasure with his supervisors' that is an interpersonal issue 'with no

9

immediate connection to the public well-being.'" (Doc. 13 at 14 (quoting Carey, 957 F.3d at 476); see Doc. 19 at 8.) The City asserts that Jones's post "[i]f I ever offended you, I'm sorry . . . that you're a little bitch" does not "involve at least some objective nexus to the public welfare." (Doc. 13 at 14 (quoting Carey, 957 F.3d at 478); see Doc. 19 at 8.) As to the post comparing cross-dressing and blackface, it argues this is no more than a "'contempt-communicating' comment of little public concern." (Doc. 13 at 15 (quoting Mitchell v. Hillsborough Cnty., 468 F.3d 1276, 1285 (11th Cir. 2006)).) And as to the hoarding post, it contends there is no basis within the complaint to conclude that Jones's post on the aftermath of a fire at a private residence was part of a commentary on fire safety. (Doc. 19 at 6; see Doc. 13 at 13.) The City similarly asserts there is no basis to conclude Jones's post of a meme about Dr. Levine is actually a criticism of that official's role in leading the country's response to the Covid-19 pandemic. (Doc. 19 at 7.) The remainder of the posts are of little to no public concern, the City argues, because they are not "intended to evaluate the performance of" Jones's employer. (Doc. 13 at 15 (quoting Brooks v. Arthur, 685 F.3d 367, 371 (4th Cir. 2012)).) The public, according to the City, is not "truly concerned with or interested in" any of Jones's posts. (Doc. 19 at 6 (quoting Kashdan, 70 F.4th at 703).)

Jones responds that most, if not all, of his posts implicated

10

matters of public concern.[3] According to Jones, both the post of the aftermath of a fire at a residence with hoarding conditions and the post criticizing Sheriff Rogers relate to public safety. (Doc. 16 at 8-9.) The meme of Dr. Levine implicated both efforts against the Covid-19 pandemic and the national debate around transgender rights. (Id. at 9-10). Jones argues that his post "to those watching me . . . keep watching" referred to the "unnamed persons" who had a problem with his Tyre Nichols post and not to any supervisors. (Id. at 11.)

The court agrees with Jones that several of his posts implicate matters of public concern. His comment asking "will we see another George Floyd situation" after Tyre Nichols's death following beatings by Memphis police implicates matters of public concern. It is implausible to suggest that concerns over the racial tensions and societal unrest seen after George Floyd's death, and their possible recurrence in the wake of another police-related death, were not matters of public discourse. Cf. Noble. v. Cincinnati & Hamilton Cnty. Pub. Libr., 112 F.4th 373, 381 (6th Cir. 2024) ("Whether one agrees with Noble's views or not, there is no question that he spoke to a matter of public concern — namely, whether the alleged violent and destructive

_____

[3] At the hearing, counsel for Jones conceded that the post "[i]f I ever offended you, I'm sorry . . . that you're a little bitch" would not implicate a matter of public concern.

11

tactics of BLM were appropriate means to protest the deaths of George Floyd and others."); Darlow v. Babineck, No. 21-13020, 2022 WL 15345444, at *3 (11th Cir. Oct. 27, 2022) (per curiam) ("[I]t is clear that the death of George Floyd and the resulting events were matters of public concern because at the time of the post, they were being discussed extensively in the news. We cannot conclude that Darlow's meme of George Floyd with pink skin is anything other than commentary on the racial issues raised by the George Floyd incident.") (internal citation omitted). And as Jones's counsel pointed out at the hearing, Jones — as a first responder — was uniquely positioned to be impacted by any such unrest.

Jones's posts advocating for "straight pride" and comparing cross-dressing (and perhaps implicitly transgenderism) to blackface also implicate matters of public concern. Courts have held that debate related to homosexuality and cross-dressing/transgenderism are matters of public concern. See, e.g., Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 565 (4th Cir. 2011) (noting that "topics such as academic freedom, civil rights, campus culture, sex, feminism, abortion, homosexuality, religion, and morality . . . plainly touch[] on issues of public, rather than private, concern"); Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trustees, 680 F. Supp. 3d 1250, 1287 (D. Wyoming 2023) (noting that "it could fairly be said

12

issues surrounding transgenderism are of 'political, social, or other concern to the community'").

In the City's view, these posts are not matters of public concern because the public is not "truly concerned with or interested in" them. (Doc. 19 at 6 (quoting Kashdan, 70 F.4th at 703).)  At oral argument, however, counsel for the City acknowledged that "discussion on sexual orientation can rise to a matter of public concern," but contended that these posts were merely the "boorish" commentary that falls short of the well-informed views of a public employee on topics of genuine public interest.  The problem with this argument, though, is that there is no eloquence threshold speech must clear before it touches on matters of public concern.  In Grutzmacher, for example, Plaintiff Kevin Buker posted on Facebook, "My aide had an outstanding idea . . . lets all kill someone with a liberal . . . then maybe we can get them outlawed too!  Think of the satisfaction of beating a liberal to death with another liberal . . . its almost poetic." 851 F.3d at 338.  Plaintiff Mark Grutzmacher then replied, "But . . . was it an 'assult liberal'? Gotta pick a fat one, those are the 'high capacity' ones. Oh . . . pick a black one, those are more 'scary'.  Sorry had to perfect on a cool idea!"  Id.  Relying on an expert report, the Fourth Circuit concluded that the "liberal" and "assault liberal" post and comment implicated a matter of public concern because they raised the propriety of gun

13

control legislation, a recognized topic of public concern. Id. at 343. The posts' patent boorishness did not prevent the Fourth Circuit from making such a conclusion. See id.

Here, Jones's posts are admittedly not masterpieces of social commentary. But they staked out his positions on matters of national debate. The court concludes, therefore, that his posts favoring heterosexuality and comparing cross-dressing/transgenderism to blackface implicate matters of public concern.

This conclusion applies as well to Jones's post about Dr. Levine, which plainly gives Jones's stance on transgenderism, a matter of public concern. See Willey, 680 F. Supp. 3d at 1287. Jones suggests in his briefing that the post goes beyond a mere critique of transgenderism and implicates the governmental response to the Covid-19 pandemic. (See Doc. 16 at 9.) The City contests this reading. (See Doc. 19 at 7.) Whether the post in its temporal context was additionally a criticism of the government's response to the pandemic and thus further implicates the public concern is a question better suited for a more developed record. Cf. Grutzmacher, 851 F.3d at 343-44 (relying on an expert report to conclude that the plaintiff's posts implicated the public concern).

Finally, Jones's post of photographs from a residence with hoarding conditions from an "emergency incident" (Doc. 11 at 20)

14

warrants the reasonable inference that it addressed the safety of the local community, a matter of public concern. See Goldstein, 218 F.3d at 353. Although the post itself was not attached to the complaint, it is referenced in the complaint and its attachments. (Doc. 11 at 3-4 ¶ 10; id. at 20, 22, 25-26.) Jones's appeal letter suggests the post was "made in showing pride in the job well done by [his] crew." (Id. at 22.) It is true, as the City points out, that the complaint does not specifically allege at any point that this post implicated the fire safety of the local community. (See Doc. 19 at 6; see generally Doc. 11.) At this stage, however, the court is obliged to draw all reasonable inferences in favor of Jones as the non-moving party. See Ibarra, 120 F.3d at 474. The complaint and attached materials suggest the post was taken with Jones's crew in the aftermath of a structure fire at a residence with hoarding conditions. (Doc. 11 at 20, 22, 25-26.) It is a reasonable inference that Jones's post implicated the safety of the local community, given the fire danger inherent in hoarding conditions. See, e.g., Blatch ex rel. Clay v. Hernandez, 360 F. Supp. 2d 595, 618 (S.D.N.Y. 2005) (noting that tenant's hoarding conditions had created fire hazards); Allstate Vehicle & Property Ins. Co. v. Harris, Civil Action No. 20-741, 2020 WL 4201598, at *1 (E.D. Pa. July 22, 2020) (relating Fire Marshal's Report, which noted the role of hoarding conditions in a house fire). "Matters relating to public safety are quintessential matters of 'public

15

concern.'" <u>Goldstein</u>, 218 F.3d at 353. A reasonable inference supports the conclusion that Jones's post of the aftermath of a fire, especially given Jones's knowledge and experience as a firefighter, implicates public safety and thus a matter of public concern. <u>Grutzmacher</u>, 851 F.3d at 347 (ellipsis in original) (citation omitted).[4]

## 2. Whether Jones has Plausibly Alleged that He Prevails on the <u>Pickering</u> Balance.

The City next argues that the court should dismiss Jones's First Amendment retaliation claim because even assuming Jones's posts implicate matters of public concern, Jones cannot succeed at the second stage of the First Amendment retaliation inquiry — the <u>Pickering</u> balance. According to the City, the complaint does not support a reasonable inference that Jones's interest in speaking outweighs its interest in the efficient provision of services to the public. (Doc. 13 at 16-27, Doc. 19 at 9-13.)

The City raises several arguments as to why the <u>Pickering</u> balance favors it. First, three factors magnify its interests:

---

[4] The court concludes that Jones's post criticizing Sheriff Rogers also implicates matters of public concern, as it implicates both the safety of the local community and local political decisions. The City argues that the post is merely criticism of a fellow official for purportedly boorish off-duty conduct that does not implicate a matter of public concern under <u>Carey</u>, 957 F.3d at 475. (Doc. 19 at 6-7.) <u>Carey</u> appears distinguishable, however, because the criticism in that case was not directed toward an elected official, such as the sheriff, and in context was merely part of an interpersonal dispute between an employee and his former captain. <u>See</u> <u>generally</u> <u>id.</u> However, even if Jones's post criticizing Sheriff Rogers did not implicate a matter of public concern, the court's conclusion on the Pickering balance, <u>infra</u>, would not change.

16

(1) the paramilitary structure of GFD; (2) Jones's leadership role; and (3) "the disrespect [Jones's] posts showed for members of the Greensboro community and members of GFD." (Doc. 13 at 20, 20-26.) Second, Jones's interests in his posts are minimal because the posts are not "grounded . . . in specialized knowledge [nor do they] express[] a general concern about the inability of the [GFD] to carry out its vital public mission effectively." (Id. at 26 (quoting Grutzmacher, 851 F.3d at 347-48).) The City characterizes Jones's speech as insubordinate conduct. (Id. at 18-19.)

Few cases, if any, resolve the Pickering balance against the plaintiff at the Rule 12(b)(6) stage where the plaintiff has alleged more than a de minimis interest in speech on a matter of public concern. Rather, the balancing usually implicates fact questions appropriate for summary judgment. See, e.g., Grutzmacher, 851 F.3d at 344-48 (concluding summary judgment for defendant was appropriate and relying on evidence adduced in discovery); Maciariello, 973 F.2d at 299-301 (same); Ridpath, 447 F.3d at 318 (stating that "we cannot say that Ridpath will be unable to show that his interest in first Amendment expression outweighed the University's interest in the efficient operation of his workplace" and noting that "[n]othing in the Amended Complaint indicates, for example, that his comments impaired the maintenance of discipline, hurt workplace morale, or constituted an abuse of his position").

17

Although the City properly notes that the Pickering balance can be completed at this stage, see Doc. 19 at 10-12, the cases which do so are distinguishable. In one case, the plaintiff school test coordinator contacted news media to let students and parents know of safe testing alternatives to in-person testing during the Covid-19 pandemic, including by opting out of testing. McCoy v. Kanawha Cnty. Bd. of Educ., No. 2:23-cv-314, 2024 WL 1805005, at *4 (S.D. W. Va. Apr. 25, 2024). The court concluded that although this amounted to speech on a topic of public concern, the test coordinator failed the Pickering balance because her statements to the media were "misleading," and "belie[d]" by the U.S. Department of Education's guidance on which she purported to rely. Id. at *16, *17. In another case, the plaintiff assistant county attorney was fired after she was elected to the city council because her dual role created an "incurable conflict of interest." Loftus v. Bobzien, 848 F.3d 278, 289-90 (4th Cir. 2017). That plaintiff also failed to sufficiently allege what portions of speech, if any, were at issue. See id. at 289. And in yet another case, the plaintiff — who had not been fired, had his pay reduced, or been demoted — failed the Pickering balance because he failed to properly plead retaliatory acts by his employer, leaving the court to conclude he had alleged at most a de minimis harm. Sullivan v. City of Frederick, No. JKB-17-1881, 2018 WL 337759, at *6 (D. Md. Jan. 9, 2018), aff'd, 738 F. App'x 198 (4th Cir. 2018). None of

18

these cases stands for the proposition that a defendant may prevail on the Pickering balance at the Rule 12(b)(6) stage despite a plaintiff's more than de minimis interest in non-misleading speech on matters of public concern.

The City also emphasizes that the governmental employer need only have a reasonable fear of disruption from employee speech. (See Doc. 19 at 9-13.)  This is correct.  See Maciariello, 973 F.2d at 300.  It is also true that Jones attached the City Manager's letter upholding Jones's termination, which expressed concern that Jones's posts "interfere with the City's interest in maintaining an efficient operation." (Doc. 11 at 27.)  The question, however, is not whether the governmental employer had a reasonable fear of disruption, but whether the plaintiff's "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public." Grutzmacher, 851 F.3d at 342.  Indeed, the Fourth Circuit has "expressly caution[ed] that a fire department's interest in maintaining efficiency will not always outweigh the interests of an employee in speaking on matters of public concern." Id. at 348.  The inquiry is fact-intensive, Lawson, 828 F.3d at 252, suggesting that evidence will often be needed.  Cf. McVey, 157 F.3d at 282 ("This case will require discovery, and perhaps trial, before the district court can fully weigh McVey's interest in speaking and the public's interest in her speech against the

19

government-employer's interest in controlling that speech.") (Murnaghan, J.) (controlling opinion).

Here, Jones has expressly alleged that his posts did not affect either relationships within the fire company or his ability to lead. (Doc. 11 at 7 ¶¶ 26-29.) And Jones's posts, although perhaps not eloquent, implicate matters of public concern in a more than de minimis and non-misleading fashion, distinguishing this case from others where courts resolved the Pickering balance against the plaintiff at the Rule 12(b)(6) stage. Cf. McCoy, 2024 WL 1805005; Loftus, 848 F.3d 278; and Sullivan, 2018 WL 337759. Finally, the Pickering balance is a fact-intensive inquiry, and the burden is on the governmental employer to justify the discharge. The court concludes, therefore, that Jones has plausibly alleged his interest in speaking upon the matters of public concern will not be outweighed by the City's interest in providing effective and efficient services to the public.[5]

For these reasons, and because the City acknowledged at oral argument that it does not contest at this stage that Jones's speech was a motivating factor in his termination, reserving the right to

---

[5] Jones's appeal letter, attached to the complaint, asserts a "double standard" where other GFD individuals have made offensive posts and not been fired. (Doc. 11 at 23.) The complaint does not allege any specific facts to support this contention. The court therefore need not consider it at this stage. In any event, because the court concludes that there are fact questions as to the City's reasonable apprehension of disruption, Jones's contention of a "double standard" does not affect the City's motion to dismiss.

20

contest this third <u>McVey</u> prong at a later stage, the court concludes that the complaint has plausibly stated a claim for First Amendment retaliation. The City's motion to dismiss this claim will therefore be denied.

C. **Violation of North Carolina General Statute § 160A-169**

Jones's third cause of action alleges a violation of North Carolina General Statute section 160A-169. (Doc. 11 at 12.) That statute is entitled "City Employee Political Activity." Its "purpose" is to "ensure that city employees are not subjected to political or partisan coercion while performing their job duties, to ensure that employees are not restricted from political activities while off duty, and to ensure that public funds are not used for political or partisan activities." N.C. Gen. Stat. § 160A-169(a). To that end, it provides that no employee who is on duty or in the workplace may "(1) [u]se his or her official authority or influence for the purpose of interfering with or affecting the result of an election or nomination for political office; or (2) [c]oerce, solicit, or compel contributions for political or partisan purposes by another employee." <u>Id.</u> § 160A-169(c). Employers are forbidden from requiring employees to "contribute funds for political or partisan purposes" as a condition of employment. <u>Id.</u> § 160A-169(d). And there is a prohibition on the use of "city funds, supplies, or equipment" for partisan or political purposes. <u>Id.</u> § 160A-169(e). Nevertheless,

21

"[it] is not the purpose of this section to allow infringement upon the rights of employees to engage in free speech and free association." Id. § 160A-169(a).

The City argues that this claim should be dismissed because section 160A-169 does not provide a private right of action, and even if it did, Jones's conduct does not implicate the statute. (Doc. 13 at 28.) Jones conceded at the hearing that this statute does not contain an express private right of action, which is plainly correct from its text. Jones argues, however, that there is an implied cause of action under the statute (Doc. 16 at 18) and that his politically-oriented social media posts fall within its protections (id. at 18-20). Jones also quotes from Marbury v. Madison for the proposition that "where there is a legal right, there is also a legal remedy by suit or action at law, whenever that right is invaded." (Doc. 16 at 18-19 (quoting 5 U.S. 137, 163 (1803)).) The question for this court, therefore, is whether section 160A-169 contains an implied private right of action under North Carolina law.

Jones points to no North Carolina case that states that section 160A-169 provides a private right of action. He points to the North Carolina Court of Appeals decision in Sugar Creek Charter School, Incorporated v. Charlotte-Mecklenburg Board of Education, as establishing a framework for the creation of implied private rights of action. (Doc. 16 at 18 (relying on 673 S.E.2d 667, 673

22

(N.C. Ct. App. 2009)).)  But this argument is not persuasive.  As an initial matter, it is uncertain whether Sugar Creek accurately states the test for whether a statute creates an implied private right of action under North Carolina law.  The North Carolina Supreme Court has recently declined to endorse Sugar Creek, albeit without disavowing that decision.  See United Daughters of the Confederacy v. City of Winston-Salem by and through Joines, 881 S.E.2d 32, 52 (N.C. 2022) (assuming without deciding that Sugar Creek accurately "identified the circumstances under which a statute implicitly authorizes a private right of action").  But even if Sugar Creek is good law, section 160A-169 does not authorize a private right of action under the considerations that case identifies.  In Sugar Creek, the court of appeals stated that "an implicit right of a cause of action exists when a statute requires action from a party, and that party has failed to comply with the statutory mandate."[6]  Sugar Creek, 673 S.E.2d at 673 (emphasis added) (citing Lea v. Grier, 577 S.E.2d. 411, 415-16 (N.C. Ct. App. 2003)).  The court of appeals concluded: "We hold

---

[6] Jones's reference to Marbury v. Madison for the proposition that where there is a right, the law provides a remedy of course begs the question whether there is a legal right.  The Supreme Court has explained, however, that "even where a statute is phrased in such explicit rights-creating terms, a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private right but also a private remedy.'"  Gonzaga Univ. v. Doe, 536 U.S. 273, 284 (2002) (emphases in original) (quoting Alexander v. Sandoval, 532 U.S. 275, 286 (2001)).  Here, section 160A-169 provides neither a right nor a private remedy.

23

that [the North Carolina statute governing charter schools] creates an implied cause of action in favor of Plaintiffs when they allege violation of the mandatory provisions of this statute." Id. at 674.

Here, the statute's operative subsections list only prohibited activities. N.C. Gen. Stat. § 160A-169(c), (d), (e). The statute does not include any affirmative mandate. Jones therefore cannot show that section 160A-169 includes a private right of action under the test set out in Sugar Creek, even assuming it sets out the applicable standard. Cf. United Daughters of the Confederacy, 881 S.E.2d at 52 (noting that "even assuming, without deciding, that the Court of Appeals has correctly identified the circumstances under which a statute implicitly authorizes a private right of action in Sugar Creek Charter School, nothing in N.C.G.S. § 100-2.1 'requires action from a party' with which 'that party has failed to comply'" but rather "prohibits the removal or relocation of certain specified objects that are owned by the State or located on public property") (emphasis removed) (internal citation removed).

Jones also compares this case to Lambert v. Town of Sylva, 816 S.E.2d 187 (N.C. Ct. App. 2018). (See Doc. 16 at 19-20.) But Lambert is distinguishable for three reasons. First, it is factually distinct, as the plaintiff there alleged he was fired for having run for county sheriff as a Republican. Lambert, 816

24

S.E.2d at 190.  Second, although the plaintiff pressed several claims, including one pursuant to section 1983, id. at 193, he did not assert a standalone claim for a violation of section 160A-169, see generally id.  Instead, he asserted "wrongful termination in violation of North Carolina public policy as expressed in N.C. Gen. Stat. § 160A-169."  Id. at 190 (emphasis added).  Here, Jones's claim under section 160A-169 is asserted in addition to his separate claim for wrongful termination.  (See Doc. 11 at 12 (Fourth Cause of Action).)  Third, the Town of Sylva did not raise any challenge to the viability of a claim under section 160A-169, and the court of appeals did not consider any such challenge.  See Lambert, 816 S.E.2d at 190-91.  Lambert simply did not consider the viability of a claim under section 160A-169.  It is well settled that "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."  Webster v. Fall, 266 U.S. 507, 511 (1925).

For these reasons, the court will therefore grant the City's motion to dismiss as to Jones's claim under section 160A-169 (Third Cause of Action).

### D.  Breach of Contract

Jones alleges that the City breached his contractual rights by failing to adhere to the disciplinary procedures contained within the GFD Directives (the "Directives").  (Doc. 11 at 14-15

25

¶¶. 62-70.)  The parties dispute both whether the Directives bind the City contractually and whether the City violated the Directives.  (Doc. 13 at 29-31; Doc. 16 at 20-22; Doc. 19 at 15-16.)

In North Carolina, in the absence of an employment contract, one is employed at-will.  Kurtzman v. Applied Analytical Indus., Inc., 493 S.E.2d 420, 422 (N.C. 1997).  Under North Carolina law, "unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it."  Walker v. Westinghouse Elec. Corp., 335 S.E.2d 79, 83-84 (N.C. Ct. App. 1985).  Such policies may, however, be incorporated by explicit reference within the employment contract.  See, e.g., Hoaglin v. Duke Univ. Health Sys., Inc., 901 S.E.2d 378, 383, 385 (N.C. Ct. App. 2024).  Here, the closest Jones comes to alleging that the Directives are binding is the statement that "[a]s an employee, Defendant has a contractual right to enforce the directives and mandate punishment within its directives."[7]  (Doc. 11 at 15 ¶ 65.)

The complaint contains no allegation that Jones entered into an employment contract.  (See generally id.)  Instead, construed in the light most favorable to Jones, the natural reading of his

_____

[7] At the hearing, counsel for Jones clarified, without objection, that the reference in paragraph 65 of the complaint to "Defendant" should read instead, "As an employee Plaintiff has a contractual right to enforce the directives."

26

complaint's assertions regarding breach of contract is that he had a contractual right <u>in the Directives</u> themselves; there is no allegation or fair inference that the Directives were incorporated into any contract of employment. (See <u>id.</u> at 14-15 ¶¶ 62-70.) As the complaint stands, therefore, Jones does not plausibly allege that the Directives were incorporated into an employment contract so as to bind the City. <u>Cf.</u> <u>Guarascio v. New Hanover Health Network, Inc.</u>, 592 S.E.2d 612, 614 (N.C. Ct. App. 2004) (concluding the Code of Conduct at issue was not binding where the at-will employee did not allege the Code of Conduct was "expressly included in" the contract, and the complaint only included the "mere conclusory allegation, without supporting factual allegations, that the NHRMC Code of Conduct was part of plaintiff's employment contract").

Jones, in his briefing and at the hearing on the motion, suggested the existence of a separate written contract. (<u>See</u> Doc. 16 at 21 ("Upon information and belief, such discovery would reveal documentation showing that Plaintiff's contract of employment sufficiently incorporated the manual for breach of contract purposes.").) Of course, a plaintiff may not amend his complaint through his response brief. <u>Rhoads v. Guilford Cnty.</u>, No. 1:23-cv-854, 2024 WL 4332719, at *11 n.14 (M.D.N.C. Sept. 27, 2024). Nor through oral argument. <u>E.I. du Pont de Nemours and Co. v. Kolon Indus.</u>, 637 F.3d 435, 449 (4th Cir. 2011).

The City's motion to dismiss Jones's breach of contract claim (Fifth Cause of Action) will therefore be granted. But because counsel indicated at the hearing that he may have evidence of a contract of employment, dismissal will be without prejudice.

### E. Violation of the Right to Free Speech under the North Carolina Constitution Article 1, Section 14 and Wrongful Termination

The complaint's Second Cause of Action alleges "Violation of the Plaintiff's Rights to Free Speech as Guaranteed by the North Carolina Constitution Article 1, Section 14"; the Fourth Cause of Action alleges "Wrongful Termination for Participation in Lawful Activities." (Doc. 11 at 11-14.) The City seeks to dismiss these claims on the same grounds it seeks to dismiss the First Amendment retaliation claim.[8] (Doc. 13 at 27.) Because the court has denied the City's motion to dismiss the First Amendment retaliation claim, however, it will likewise deny the motion to dismiss these two claims.

### F. Punitive Damages

Finally, Jones's Sixth Cause of Action is entitled "Punitive Damages." (Doc. 11 at 15.) Punitive damages are, however, a remedy — not an independent cause of action. Bruton v. FirstHealth of the Carolinas, Inc., No. 1:12-cv-253, 2012 WL 5986788, at *2 (M.D.N.C. Nov. 29, 2012) (noting that "[t]he doctrine of punitive

---

[8] Jones's counsel acknowledged at the hearing that Jones's claim under the North Carolina Constitution would rise or fall with his First Amendment claim.

28

damages is a means of punishing a wrongdoer but does not, by itself, provide an independent basis for asserting a claim") (quoting Gauldin v. Honda Power Equip. Mfg., Inc._, 351 F. Supp. 2d 455, 458 (M.D.N.C. 2005)).  Because Jones's Sixth Cause of Action for punitive damages is not a freestanding claim, the City's motion to dismiss it will be granted.[9]

## III. CONCLUSION

For the reasons stated,

IT IS ORDERED that Defendants' motion to dismiss (Doc. 12) is GRANTED IN PART and DENIED in part, as follows:

The motion to dismiss Jones's First Amendment retaliation claim (First Cause of Action) is DENIED.

The motion to dismiss Jones's claim for violation of North Carolina General Statute § 160A-169 (Third Cause of Action) is GRANTED, and the claim is DISMISSED WITH PREJUDICE;

The motion to dismiss Jones's breach of contract claim (Fifth Cause of Action) is GRANTED, and the claim is DISMISSED WITHOUT PREJUDICE;

The motion to dismiss Jones's claim for violation of the North Carolina Constitution (Second Cause of Action) and Jones's claim for wrongful termination (Fourth Cause of Action) is DENIED; and

---

[9] This dismissal does not affect Jones's prayer for relief to the extent it seeks punitive damages.  (Doc. 11 at 17 ¶ 6.)

The motion to dismiss Jones's claim for punitive damages (Sixth Cause of Action) is GRANTED, and the claim is DISMISSED WITH PREJUDICE;

The motion to dismiss the GFD is GRANTED and the GFD is DISMISSED as a party to this litigation.


                                    /s/   Thomas D. Schroeder
                                    United States District Judge

March 31, 2025