DUSTIN ROBERT JONES,               )
                                   )
                Plaintiff,         )
                                   )
     v.                            )          1:24CV450
                                   )
THE CITY OF GREENSBORO and         )
GREENSBORO FIRE DEPARTMENT,        )
                                   )
                Defendants.        )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This is an action by Plaintiff Dustin Robert Jones against his former employer, Defendant the City of Greensboro (the "City"), asserting several claims pursuant to 42 U.S.C. § 1983 and the First Amendment to the United States Constitution, the North Carolina Constitution, and North Carolina state law. (Doc. 11.) Before the court are the parties' cross-motions for summary judgment (Docs. 45, 46), as well as the City's motion to seal (Doc. 71). A hearing was held on the motions on July 20, 2026. For the reasons set forth below, the City's motion for summary judgment (Doc. 46) will be granted; Jones's motion for summary judgment (Doc. 45) will be denied; and the City's motion to seal (Doc. 71) will be granted in part and denied in part.

## I.   BACKGROUND

The court sets out the facts in the light most favorable to the non-moving parties in the cross-motions for summary judgment.

See Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011) ("When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure.").

## A. Factual Background

Jones is a U.S. Navy veteran who served as a firefighter with the Greensboro Fire Department ("GFD") for more than 16 years, achieving the rank of captain. (Doc. 11 ¶¶ 5-6.) The GFD is a paramilitary organization with approximately 27 fire stations and 600 members, around 120 of whom are captains. (Doc. 59-2 at 4, 11, 15.) Captains represent the "middle management" of the GFD. (Id. at 10.) Thus, their responsibilities require that they lead, supervise, and discipline their crews, manage their fire stations, and foster public relations and community engagement. (Doc. 59-6 ¶ 4.)

In 2021, Jones began a series of posts on his Facebook page that resulted in attempts at corrective action by his leadership and, ultimately, his termination. First, in March 2021, Jones responded to a structure fire at a private residence with hoarding conditions. (Doc. 59-8 at 2; Doc. 60-24 at 39-40.) He posted a photograph of the interior of the private residence and noted, "Just an example of some of our 'working conditions' . . . . . from our job last night." (See Doc. 68-5.)

2

This post violated GFD social media policy because it constituted the unauthorized disclosure of the interior of a citizen's private residence.  (See Doc. 59-8 at 2; Doc. 59-9 at 4.)  Jones received a coaching session on March 10, 2021 for the inappropriate use of social media, and he apologetically removed the post.  (Doc. 59-8 at 3.)

In November 2022, Jones reposted a Facebook video of Guilford County Sheriff Danny Rogers dancing at the North Carolina A&T State University homecoming parade, on which Jones commented, "This is the clown in charge of keeping you safe.  Freaking Joke."  (See Doc. 59-11.)  The original poster had previously commented, "When yo[ur] Sherrif [sic] is black."  (Id.)  Then, on another repost of the same video, Jones added the comment, "I can't reply.  I might get my hand smacked."  (Doc. 59-10 at 3.)  This comment was in response to another person who questioned whether Sheriff Rogers was "pandering to" North Carolina A&T State University and "showing preferential support" for its students and alumni.[1]  (Id.)  Sheriff Rogers was up for reelection at the time.  (Doc. 11 at 23.)

City personnel became aware of these posts involving Sheriff Rogers from a citizen's report (see Doc. 59-10 at 8-9), and GFD Deputy Chief Dwayne Church met with Jones, along with Maria Hicks-

---

[1] North Carolina A&T State University is a historically black university. About N.C. A&T, N.C. Agric. & Tech. State Univ., https://ncat.edu/about/index.php (last visited Aug. 10, 2026).

Few from the City's human resources department, on November 18, 2022 (Doc. 65-1 at 1; Doc. 65-30 at 27). Jones received counseling at this meeting that his post describing Sheriff Rogers as a clown could be perceived as racist. (Doc. 65-30 at 29.) At the direction of Deputy Chief Church and Hicks-Few, Jones removed the post and reviewed a copy of the GFD's social media directive. (Id. at 27-28.)

In February 2023, following the killing of Tyre Nichols by Memphis police, Jones shared the headline of a related FOX8 WGHP news article and commented, "will we see another George Floyd reaction? Will city's [sic] burn??? ALL LIVES MATTER."[2] (See Doc. 59-13.) This time, GFD Chief Jim Robinson met with Jones. (Doc. 65-1 at 1.) Chief Robinson explained that the reports of Jones's postings were making their way to him as chief, told Jones that he thought he "had a target on his back," and cautioned Jones to "just be careful" as the chief "had a lot invested in [Jones]." (Doc. 65-31 at 16.) Chief Robinson told Jones that his posts were "borderline," and the chief's handwritten notes from the date of the meeting indicate that he told Jones that the post had been "just within policy," based on guidance he received from legal counsel. (Doc. 60-14 at 2.) Moreover, Chief Robinson's notes indicate that he "ask[ed] [Jones] to stop with the post[s] that

---

[2] Nichols was a 29-year-old African American man fatally beaten by African American officers of the Memphis Police Department.

4

could be viewed as offensive." (Id.) Jones understood from this meeting that his "employment could be threatened" if he continued to share "political speech" on social media. (Doc. 59-1 at 12-13.) Shortly thereafter, Jones posted, "To those watching me . . . . . keep watching . . . ." (See Doc. 59-17.) Jones also posted a screenshot from Wikipedia around the same time, which read in part: "**Freedom of speech** is a principle that supports the freedom of an individual or community to articulate their opinions and ideas without fear of retaliation, censorship, or legal sanction." (See Doc. 65-9.)

Over the next several months, Jones continued posting controversial material to his Facebook page. These posts included the following:

- A photograph of a keychain stating, "IF I'VE EVER OFFENDED YOU, I'M SORRY . . . THAT YOU'RE A LITTLE BITCH," with Jones adding, "[']Bout right . . . . ." (Doc. 59-18 at 6 (first and third alterations in original).)

- "Straight Pride. it's Natural, it's Worked for Thousands of years, and you Can Make Babies." (Id. at 5.)

- "IF THIS IS A WOMAN," (superimposed on a photograph of Rachel Levine, United States Assistant Secretary for Health during the COVID-19 pandemic) "THIS IS A FISHING POLE" (superimposed on a photograph of an assault rifle). (Id. at 4.)

5

- "You know what's insane . . . . A white person can paint their [sic] face black and be accused of being a racist. Yet a man can dress as a woman and be called a hero . . . . . . ."; this post, dated April 25, 2023, was accompanied by a definition of blackface from Wikipedia. (Id. at 3 (alterations in original).)

- "I identify as invisible. I'm TRANSparent . . . . . My pronouns are who/where?" This post was also made on April 25, 2023. (Id. at 2 (alterations in original).)

Members of the GFD knew of and discussed Jones's posts. (Doc. 59-15 ¶ 4; Doc. 59-16 ¶ 4.) Moreover, at least some members of the GFD knew that Jones had been coached by GFD leadership to stop this type of posting on social media. (Doc. 59-15 ¶ 4; Doc. 59-6 ¶ 11.)

On May 12, 2023, Chief Robinson and Deputy Chief Church met with Jones and terminated his employment. (Doc. 59-2 at 18-19; see Doc. 65-1 at 1-2.) The termination letter, presented to Jones during the meeting, noted that his "posts ha[d] become increasingly offensive and discriminatory" and that Chief Robinson had determined his conduct "to be egregious to the point that it erode[d] public trust and negatively impact[ed] or interfere[d] with the day to day operations of the Fire Department." (Doc. 65-1 at 2.) Chief Robinson attests that he had never terminated another firefighter for his or her social media posts. (Doc. 68-

6

31 at 11.)

Jones appealed to Taiwo Jaiyeoba, Greensboro City Manager. (See Doc. 65-2.)  City Manager Jaiyeoba affirmed Chief Robinson's decision on May 26, 2023, finding Jones's dismissal appropriate because his "misuse of social media and disrespectful treatment of others continued despite repeated coaching sessions and opportunities to improve."  (Doc. 65-3 at 1.)  He further noted that "[t]he net effect" of Jones's posts was "to dehumanize, delegitimize, disparage and disrespect those who are different from [Jones]."  (Id. at 3.)  According to City Manager Jaiyeoba, the City "simply cannot tolerate this type of behavior from a leader of this organization."  (Id.)

After his termination, Jones received text messages of support from several GFD firefighters.  (See Doc. 65-19 at 3-6; Doc. 65-20 at 3-4; Doc. 65-23 at 3.)  Moreover, on June 6, 2023, several firefighters and members of the public addressed Jones's termination at the Greensboro City Council's bimonthly meeting. Meeting Agenda City Council, City of Greensboro, https://pub-greensboro-nc.escribemeetings.com/Meeting.aspx?Id=91d17686-0485-46f7-9224-0872d227a951&Agenda=Agenda&lang=English  (last visited Aug. 10, 2026).[3]  Thirteen citizens noted their support for Jones's termination, while four spoke in opposition.  (Id.)  Those citizens

---

[3] The City cites to this meeting in its brief in support of its motion for summary judgment.  (See Doc. 59 at 12.)

who supported his termination largely focused on Jones's social media activity.  (Id.)

### B.    Procedural Background

On May 9, 2024, Jones filed this lawsuit in North Carolina state court.  (Doc. 4.)  Defendants timely removed the case to this court (Doc. 1), and Jones filed an amended complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure (Doc. 11).  Defendants then filed a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) (Doc. 12), which the court granted in part and denied in part (Doc. 21).  Specifically, the court dismissed the GFD as a party and dismissed Jones's claims for violation of North Carolina General Statute § 160A-169, breach of contract, and punitive damages.  (Doc. 21 at 29-30.)  Thus, only Jones's claims against the City for First Amendment retaliation, violation of the North Carolina Constitution, and wrongful termination remain.  (Id.)

Following discovery, the parties brought the present motions. First, the parties filed cross-motions for summary judgment on Jones's claims for First Amendment retaliation (First Cause of Action) and violation of the North Carolina Constitution (Second Cause of Action).  (Docs. 45, 46.)  Second, the City moves for summary judgment on Jones's wrongful termination claim (Fourth

Cause of Action).[4]  (Doc. 46.)  Each party also filed respective responses in opposition (Docs. 60, 66 (redacted); Docs. 63, 69 (sealed)), and replies (Docs. 61, 67 (redacted); Docs. 64, 70 (sealed)).

Pursuant to Local Rule 5.4(c) and the court's Order on the parties' Joint Motion for Entry of Amended L.R. 5.5 Order (Doc. 48), the City also filed a motion to seal certain personnel records of current or former GFD employees other than Jones, along with information derived from these records and "otherwise sensitive personal information."  (Doc. 71 at 2.)  Jones filed a response in opposition to some portions of the City's motion to seal (Doc. 72), and the City replied (Doc. 73).

All pending motions are fully briefed and ready for decision.

## II.  ANALYSIS

### A.  Cross-Motions for Summary Judgment

#### 1.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the

_____

[4] Neither Jones's response in opposition to the City's motion for summary judgment nor his brief in support of his own motion for summary judgment addresses his wrongful termination claim.  (See generally Docs. 60, 65 (redacted); Docs. 63, 68 (sealed).)

nonmoving party.'" Basnight v. Diamond Devs., Inc., 146 F. Supp. 2d 754, 760 (M.D.N.C. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining a motion for summary judgment, the "court views the evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." Id. Summary judgment should be denied "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Guessford v. Pa. Nat'l Mut. Cas. Ins. Co., 983 F. Supp. 2d 652, 659 (M.D.N.C. 2013) (quoting Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994)).

While the movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact, once that burden has been met, the non-moving party must demonstrate the existence of a genuine dispute of material fact. Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). A mere scintilla of evidence is insufficient to circumvent summary judgment. Anderson, 477 U.S. at 252; Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013) ("[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."); see also Felty v. Graves-Humphreys

10

Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (noting that there is an affirmative duty for "the trial judge to prevent 'factually unsupported claims and defenses' from proceeding to trial" (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986))). Instead, the nonmoving party must convince the court that, upon the record taken as a whole, the rational trier of fact could find for the nonmoving party. Anderson, 477 U.S. at 248-49. Trial is unnecessary only if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315-16 (4th Cir. 1993).

The standard of review on cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. See Desmond, 630 F.3d at 354. Thus, the court must "consider 'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" Bacon v. City of Richmond, 475 F.3d 633, 638 (4th Cir. 2007) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)). "When considering each individual motion, the court must take care to 'resolve all factual disputes and any competing, rational inferences in the light most favorable' to the party opposing that motion." Rossignol, 316 F.3d at 523 (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)).

11

### 2. Wrongful Termination Claim

The City argues that governmental immunity bars Jones's wrongful termination claim. (Doc. 59 at 14.) As noted, neither Jones's response in opposition nor his own motion for summary judgment addresses the wrongful termination claim. (See generally Docs. 60, 65.)

Governmental immunity "shields 'units of local government from suit for acts committed in their governmental capacity.'" Est. of Graham v. Lambert, 898 S.E.2d 888, 895 (N.C. 2024) (quoting Providence Volunteer Fire Dep't, Inc. v. Town of Weddington, 876 S.E.2d 453, 462 (N.C. 2022)). North Carolina courts have repeatedly held that the termination of a public employee constitutes a governmental function. Oleyar v. County of Durham, 336 F. Supp. 2d 512, 520 (M.D.N.C. 2004) (first citing Phillips v. Gray, 592 S.E.2d 229, 232 (N.C. Ct. App. 2004); and then citing Paquette v. County of Durham, 573 S.E.2d 715, 717 (N.C. Ct. App. 2002)). A governmental entity "may, however, waive such immunity through the purchase of liability insurance." Dawes v. Nash County, 584 S.E.2d 760, 763 (N.C. 2003) (quoting Doe v. Jenkins, 547 S.E.2d 124, 126 (N.C. Ct. App. 2001)).

Here, Jones has produced no evidence that the City has waived governmental immunity. By contrast, the City has produced an affidavit from Teresa Johnston, the Executive Director of the Guilford City/County Insurance Advisory Committee, to demonstrate

12

that the City has not purchased liability insurance to cover Jones's wrongful termination claim. (<u>See</u> Doc. 59-22 ¶¶ 2-3.) Nor does the City participate in a local government risk pool. (<u>Id.</u> ¶ 7.) Thus, no dispute exists as to whether governmental immunity bars Jones's wrongful termination claim against the City, and the court will grant the City's motion for summary judgment on this claim.

### 3. First Amendment Retaliation Claim

"The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" <u>Connick v. Myers</u>, 461 U.S. 138, 145 (1983) (quoting <u>Roth v. United States</u>, 354 U.S. 476, 484 (1957)). Public employees do "not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment," <u>id.</u> at 140, and the court must "ensure that citizens are not deprived of fundamental rights by virtue of working for the government," <u>id.</u> at 147. "That being said, precedent makes clear that courts must also consider 'the government's countervailing interest in controlling the operation of its workplaces.'" <u>Hunter v. Town of Mocksville</u>, 789 F.3d 389, 396 (4th Cir. 2015) (quoting <u>Lane v. Franks</u>, 573 U.S. 228, 236 (2014)). Thus, a public employee "by necessity must accept certain limitations on his or her freedom." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418 (2006). To maintain a claim pursuant to the First

13

Amendment for retaliatory discharge, the plaintiff must satisfy a three-prong test:

> (1) that he was a "public employee . . . speaking as a citizen upon a matter of public concern [rather than] as an employee about a matter of personal interest;" (2) that his "interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public;" and (3) that his "speech was a substantial factor in the employer's termination decision."

Grutzmacher v. Howard County, 851 F.3d 332, 342 (4th Cir. 2017) (alterations in original) (quoting McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir. 1998)).

The parties agree that Jones's claim brought pursuant to the North Carolina Constitution rises or falls with his First Amendment retaliation claim. (See Doc. 21 at 28 n.8.) Moreover, in this court's previous ruling, it found that several of Jones's posts implicated matters of public concern. (Id. at 11.) Accordingly, the court now turns to whether Jones's interest in speaking on matters of public concern outweighed the City's interest in providing effective and efficient services to the public. See McVey, 157 F.3d at 277; see also Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its

14

employees.").

In support of its motion for summary judgment, the City contends that Jones's posts created potential and actual disruption both within the GFD and between the GFD and the community. (Doc. 59 at 19, 21-28.) The City also asserts that Jones's conduct amounted to insubordination, damaging Jones's ability to enforce GFD policies and threatening the paramilitary hierarchy of the GFD. (Id. at 19-20, 28-31.)

In support of his motion for summary judgment, Jones argues that the City failed to consider his First Amendment rights when it terminated his employment. (Doc. 65 at 22-23.) He further asserts that his commentary on matters of public concern drew on particular knowledge he possessed as an experienced firefighter. For example, he points to his frequent interaction with the Guilford County Sheriff's Office, which he contends made him "specially situated" to evaluate Sheriff Rogers's ability to keep the public safe. (Id. at 24.) He also highlights his experience addressing fires caused by hoarding and rioting, in reference to his posts depicting a private residence and the news article on the Tyre Nichols killing. (Id.) Finally, he argues that the City falsely assumed his insubordination "to craft a narrative" of defiance, and he references several statements and text messages from firefighters who opposed his termination. (Id. at 24-25.)

The Pickering/McVey "balancing test is a 'particularized'

15

inquiry." Grutzmacher, 851 F.3d at 348 (quoting Goldstein v. Chestnut Ridge Volunteer Fire Co., 218 F.3d 337, 356 (4th Cir. 2000)). In balancing Jones's First Amendment interest against the City's interests, the court must "consider the context in which the speech was made, including the employee's role and the extent to which the speech impairs the efficiency of the workplace." Smith v. Gilchrist, 749 F.3d 302, 309 (4th Cir. 2014).

> Factors relevant to this inquiry include whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 317 (4th Cir. 2006). Further, "in this balancing test, 'the government bears the burden of justifying the discharge on legitimate grounds.'" Lawson v. Union Cnty. Clerk of Ct., 828 F.3d 239, 252 (4th Cir. 2016) (citation modified) (quoting Gilchrist, 749 F.3d at 309). However, "to demonstrate that an employee's speech impaired efficiency, a government employer need not 'prove that the employee's speech actually disrupted efficiency, but only that an adverse effect was reasonably to be apprehended.'" Grutzmacher, 851 F.3d at 348 (citation modified) (quoting Maciariello v. Sumner, 973 F. 2d 295, 300 (4th Cir. 1992)). "Whether the employee's

16

interest in speaking outweighs the government's interest is a question of law for the court." <u>Gilchrist</u>, 749 F.3d at 309.

"'[F]ire companies have a strong interest in the promotion of camaraderie and efficiency' as well as 'internal harmony [and] trust.'" <u>Grutzmacher</u>, 851 F.3d at 345 (alterations in original) (quoting <u>Goldstein</u>, 218 F.3d at 355). Courts thus "accord 'substantial weight' to a fire department's interest in limiting dissension and discord." <u>Id.</u> (quoting <u>Goldstein</u>, 218 F.3d at 355). Nevertheless, as the Fourth Circuit has cautioned, "a fire department's interest in maintaining efficiency will not always outweigh the interests of an employee in speaking on matters of public concern." <u>Id.</u> at 348. "A social media platform amplifies the distribution of the speaker's message – which favors the employee's free speech interests – but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency." <u>Liverman v. City of Petersburg</u>, 844 F.3d 400, 407 (4th Cir. 2016).

As the City contends, the United States Court of Appeals for the Fourth Circuit's decision in <u>Grutzmacher</u> guides this case. (Doc. 59 at 33-34; Doc. 61 at 13-15.) In <u>Grutzmacher</u>, a county fire department fired a battalion chief after he posted to his Facebook page, "My aide had an outstanding idea . . lets [sic] all kill someone with a liberal . . . then maybe we can get them

17

outlawed too!  Think of the satisfaction of beating a liberal to death with another liberal . . . its [sic] almost poetic . . . ,'" and he "liked" another firefighter's comment, "But . . . . was it an 'assault liberal'?  Gotta pick a fat one, those are the 'high capacity' ones. Oh . . . pick a black one, those are more 'scary.' Sorry had to perfect on a cool idea!"  Grutzmacher, 851 F.3d at 338 (alterations in original).  Moreover, after his initial disciplining by the department, the battalion chief "liked" another Facebook post depicting an elderly woman raising her middle figure with the caption, "THIS PAGE, YEAH THE ONE YOU'RE LOOKING AT IT'S MINE[.]  I'LL POST WHATEVER THE F*** I WANT."  Id.  at 339 (first alteration in original).  This post appeared to be directed at the department leadership, as it stated, "for you Chief."  Id.

The Fourth Circuit concluded that at least some of the battalion chief's Facebook activity implicated matters of public concern.  Id. at 344.  However, the court held that the fire department's interest outweighed the battalion chief's interest in speech, and thus it affirmed summary judgment in favor of the fire department on the battalion chief's First Amendment retaliation claim.  Id. at 348.  Specifically, the court noted that his speech resulted in numerous difficult conversations between at least one other battalion chief and lower-level employees, in addition to one African American employee's expressed desire not to work for the battalion chief anymore because of a lack of trust.  Id. at

345-46.  The court also considered the battalion chief's managerial role, his perceived defiance and insubordination, and the lack of specialized knowledge or legitimate public safety concern associated with his posts.  Id. at 346-48.

Here, like the fire department in Grutzmacher, the City reasonably perceived Jones's continued posting as insubordinate. "A public employee's interest in speaking on matters of public concern 'does not require that a public employer tolerate associated behavior that it reasonably believed was disruptive and insubordinate.'"  Id. at 347 (citation modified) (quoting Dwyer v. Smith, 867 F.2d 184, 194 (4th Cir. 1989)).  The record demonstrates that Jones received three coaching sessions in which supervisors expressed disapproval of his posts.  (See, e.g., Docs. 59-8, 59-12, 59-14.)  Though his post regarding Tyre Nichols was "just within policy," Chief Robinson cautioned Jones at the third session to "be careful."[5]  (Doc. 59-2 at 28-29.)  Chief Robinson's handwritten notes from this meeting further indicate that he "ask[ed] [Jones] to stop with the post[s] that could be viewed as offensive."  (Doc. 60-14 at 2.)  Indeed, Jones himself understood

---

[5] Though Jones's counsel attempted to distinguish Grutzmacher at the hearing on the ground that the plaintiff in Grutzmacher received an explicit warning before his termination (Doc. 78 at 46:7-11), the court's opinion only reflects that the assistant fire chief "direct[ed] him to review his recent Facebook posts and to remove anything inconsistent with the Department's social media policy," Grutzmacher, 851 F.3d at 338.  Here, in addition to Chief Robinson's guidance, Deputy Chief Church previously told Jones to review the GFD's social media policy.  (See Doc. 65-30 at 27.)

19

from the coaching sessions with GFD leadership that his "employment could be threatened" if he continued posting controversial political speech to his social media. (Doc. 59-1 at 12.) Yet, as Jones's counsel conceded at the hearing, his subsequent posts continued to test the boundary of acceptability within the GFD's policy,[6] and he crossed the line with, at minimum, the repost stating: "IF I'VE EVER OFFENDED YOU, I'M SORRY . . . THAT YOU'RE A LITTLE BITCH." (Doc. 78 at 34:10-35:8.)

Per Chief Robinson, Jones's disregard of the coaching he received "was a known fact among parts of the GFD." (Doc. 59-6 ¶ 11.) Similarly, one battalion chief attested that GFD firefighters knew of the "coaching" efforts made by GFD leadership toward Jones and that Jones's continued posting seemed "defiant" and intended to "stir the pot." (Doc. 59-15 ¶ 4.) Multiple firefighters with supervisory roles in the GFD (who were identified by Jones as persons with knowledge of GFD's alleged discrimination) have also provided declarations agreeing that conduct like Jones's "cannot be tolerated" because it "risks significant disruption to the [GFD's] effective operations and undermines leadership, discipline, and public trust."[7] (Doc. 59-25 ¶ 7; Doc. 59-26 ¶ 7;

_____

[6] Unlike the plaintiff in Grutzmacher, Jones has not levied any challenge to the GFD's social media policy.

[7] Jones does not object to this testimony. Whether its admissibility could be questioned as lay opinion lacking in contemporaneous knowledge, see United States v. Perkins, 470 F.3d 150, 155-56 (4th Cir. 2006), need not be determined, as Defendants have otherwise demonstrated a reasonable

20

Doc. 59-27 ¶ 7; Doc. 59-28 ¶ 7.)

Jones counters that he received only "equivocal" and "ambiguous" counseling and "coaching sessions," rather than "clear directives," on his social media behavior.  (Doc. 60 at 17-18.) He also contrasts his termination with other GFD employees who received less harsh disciplinary measures for their own posts, and he asserts that the City ignored its own policy favoring progressive discipline.  (Id. at 18.)  Finally, he argues that the City ignores the context of his post, "To those watching me . . . . . keep watching . . . . ," by disregarding his nearly contemporaneous post on freedom of speech and his testimony that he did not intend to direct this post at the GFD leadership, but rather at those individuals who, according to Chief Robinson, had placed "a target on his back."  (Id. at 18-19.)

Jones's posts may well represent a form of argumentative (albeit inflammatory) social commentary based on his legitimately held beliefs, and he may have intended to direct the "keep watching" post at the individuals who had placed a "target on his back."  And to be sure, in Grutzmacher, the post of an elderly woman raising her middle finger with the comment directed at the chief that the plaintiff "liked" was more obviously directed at his department leadership.  See Grutzmacher, 851 F.3d at 339.  But

_____

perception of disruption and insubordination in light of the other record evidence.

21

critically, the City need only demonstrate that it reasonably believed Jones's speech to be insubordinate and disruptive, not that Jones intended his speech as such. See id. at 347; see also Morris v. Crow, 117 F.3d 449, 458 n.3 (11th Cir. 1997) (noting, in the context of the Pickering balancing test, that "the perceived character of the speech is more relevant than the subjective intentions that accompany its delivery").

Jones's response relies in part on his claims of disparate treatment compared to other firefighters who posted controversial material to social media but were not terminated. (Doc. 63 at 15, 18.) For example, he points to one firefighter's post referencing "Black Pride" alongside the terms "Natural," "Dope," "Educated," "Melanin," and "Classy" (Doc. 63-15 at 1), and a post from a GFD captain reading, "PSA . . . . . If you want to live . . . walk towards the police and tell them you are going to kill them. DON'T WALK AWAY" (Doc. 63-17 at 3). He also highlights several posts from another firefighter, to include one depicting a "Truly" draft beer tap handle with the caption, "White gurl [sic] heaven . . . . truly on tap . . . ." and another of a meme stating, "My generation had WONDER WOMAN . . . y'all generation is WONDERING if that's a WOMAN." (Doc. 63-16 at 11, 14.) Jones elsewhere contends that the alleged disparate treatment of other firefighters amounts to a "double standard" that singled out his "Christian conservative" views. (Doc. 65 at 18-19.) He does not

22

identify any case indicating that comparators or disparate treatment are relevant to the Pickering/McVey balancing test, cf. L.R. 56.1(d), (e) (requiring parties on summary judgment to cite supporting authority), and the court is aware of none. Nevertheless, his counsel asserted at the hearing that the fact that other firefighters were not terminated for their controversial social media posts demonstrates that the City favors certain "types and classes of speech" over others. (Doc. 78 at 48:23-53:6.)

Even if comparators were relevant, the undisputed facts contradict Jones's claims of disparate treatment because - unlike the other firefighters who all received some level of discipline for their potentially offensive posts (upon GFD's knowledge of them) and then stopped posting (see Doc. 62-6 ¶ 13; 63-25 at 11-12; Doc. 64-1 at 3; Doc. 69-2 ¶¶ 5-8) - Jones's problematic social media activity intensified after he met with Chief Robinson.[8] Jones's argument that the City failed to follow its own progressive discipline policy in terminating his employment is also difficult to square with the fact that he received three separate coaching

---

[8] Jones's counsel acknowledged at the hearing that he was "not sure if those specific employees ever did it again." (Doc. 78 at 52:1-2.) The record does not reflect that the alleged comparators made any additional problematic posts after they were counseled by GFD leadership. In fact, in the letter upholding Jones's termination, City Manager Jaiyeoba referenced the alleged comparators and noted that "those employees received coaching and actually changed their behavior." (Doc. 65-3 at 3.)

23

sessions from March 2021 to February 2023 regarding his social media posts.[9]  Moreover, his post on freedom of speech does not materially detract from the City's perception of his posting as disruptive and insubordinate.  The City therefore reasonably apprehended that its toleration of Jones's posts would "impair[] the maintenance of discipline" at the GFD.  See Ridpath, 447 F.3d at 317.

Further, the City's evidence of the reasonable apprehension of disruption extends beyond its perception of Jones's conduct as insubordinate.  To begin, the City has demonstrated that Jones's Facebook activity created some disruption within the GFD itself.  One battalion chief, for example, "observed that Jones's social media activity was creating difficult conversations and disruption within certain parts of the daily GFD environment."[10]  (Doc. 59-15 ¶ 5.)  An African American firefighter who worked for the GFD at the time of Jones's termination also attested that Jones's posts generated "considerable discussion" among the GFD and that his posts led her to "fear that [she] could not trust him as [her]

---

[9] Jones does not elaborate on or cite to the City's alleged progressive disciplinary policy.  (See Doc. 63 at 15, 18.)

[10] To the extent Jones objects to the consideration of these conversations on hearsay grounds, the battalion chief has not provided any "out-of-court statements offered 'to prove the truth of the matter asserted.'" See Smith v. Arizona, 602 U.S. 779, 785 (2024) (quoting Anderson v. United States, 417 U.S. 211, 219 (1974)).  Thus, the court may rely on the battalion chief's testimony regarding the conversations "to illustrate the disruptive effect of Plaintiff's speech."  See Grutzmacher, 851 F.3d at 346 n.5.

24

commanding officer and fellow firefighter."[11]  (Doc. 59-16 ¶¶ 4-5.)

Jones's response that some firefighters opposed his termination and that the City's evidence relies on declarations from supervisors rather than line-level firefighters does not raise a genuine dispute of material fact as to whether the City reasonably anticipated disruption in the GFD.  And, while Jones speculates that there may have been some who sought to discredit him for his views, as his counsel conceded at argument the record provides no evidence that any declarant or other GFD personnel claiming disruption or otherwise favoring Jones's termination harbored any personal animosity toward him.  (Doc. 78 at 71:1-7.) The court therefore accords "substantial weight" to the City's interest in preventing Jones from impairing harmony among coworkers at the GFD.  See Grutzmacher, 851 F.3d at 346 (lending substantial weight to the fire department's interest in workplace harmony in part because one African American firefighter stated, "I don't want to work for [Plaintiff] anymore.  I don't trust him."

---

[11] At the hearing, Jones's counsel distinguished Grutzmacher on the grounds that the African American firefighter there had voiced contemporaneous concerns over his or her ability to work with the plaintiff, whereas the evidence here only demonstrates similar concerns shared after Jones's termination. (Doc. 78 at 53:13-54:15.)  To be sure, contemporaneous concerns would provide stronger evidence of actual internal disruption.  However, the City need only provide evidence of a reasonable apprehension of disruption, and the fact that at least one African American firefighter harbored concerns over her ability to trust Jones because of his posts supports the City's position.

25

(alteration in original)).

Jones's leadership position exacerbated the potential disruption caused by his posts. "The expressive activities of a highly placed supervisory employee will be more disruptive to the operation of the workplace than similar activity by a low level employee with little authority or discretion." Id. (citation modified) (quoting McEvoy v. Spencer, 124 F.3d 92, 103 (2d Cir. 1997)). And here, according to Chief Robinson, captains "set the standard" within the GFD. (Doc. 59-2 at 10.) Thus, as a captain, Jones was "responsible for ensuring implementation of the GFD's policy and mission." (Doc. 59-6 ¶ 4.) Yet as noted, according to one battalion chief, personnel throughout the GFD knew that Jones had been "coached" on his "offensive posts" but continued posting, thereby creating a perception of public defiance. (Doc. 59-15 ¶ 4.)

Contrary to Jones's response (see Doc. 60 at 23), the fact that Jones did not post "in a supervisory capacity" or direct the posts "at his subordinates" does not preclude the City's finding of potential disruptive effect on his workplace relationships where, as here, the posts generated discussion and concern among firefighters at his workplace. Notably, Jones prominently displayed his employment with the GFD on his Facebook page, including, at least at one point, setting his profile photograph as a photograph of him in his GFD uniform. (Doc. 62-2 at 26; Doc.

26

62-6 ¶ 9.) And while Jones attempts to distinguish Grutzmacher by arguing that he occupied a lower position in the departmental hierarchy than a battalion chief, it is not the "policymaking" but rather the policy-enforcing (that is, supervisory) nature of the speaker's role that leads to heightened concerns over disruption. (See Doc. 59-15 ¶ 5; Doc. 59-16 ¶¶ 4-5.) Moreover, though battalion chiefs occupy a higher position than captains in the GFD, the more relevant comparison is that the battalion chief position described in Grutzmacher appears roughly equivalent to that of captain at GFD, which was Jones's role. See Grutzmacher, 851 F.3d at 337 ("Although positioned at the lower end of the chain-of-command, . . . battalion chiefs directly supervise first responders."). Thus, Jones's position as captain also weighs in the City's favor by increasing the potential disruption to the maintenance of discipline at the GFD. See Ridpath, 447 F.3d at 317; Grutzmacher, 851 F.3d at 346 (weighing the firefighter plaintiff's battalion chief role in favor of the defendants in part because of concerns regarding his "fitness as a supervisor and role model" created by his "flouting Department policies he was expected to enforce").

Next, the City has produced evidence that Jones's conduct threatened the GFD's relationship with the community. "The more the employee's job requires public contact, the greater the state's interest in firing him for expression that offends his employer."

27

Grutzmacher, 851 F.3d at 346 (citation modified) (quoting McEvoy, 124 F.3d at 103). "[F]irefighters . . . are quintessentially public servants. As such, part of their job is to safeguard the public's opinion of them, particularly with regard to a community's view of the respect that . . . firefighters accord the members of that community." Id. (alterations in original) (quoting Locurto v. Giuliani, 447 F.3d 159, 178-79 (2d Cir. 2006)).

Here, according to City Manager Jaiyeoba, the "net effect" of Jones's posts was "to dehumanize, delegitimize, disparage and disrespect" the members of the community who were different from him. (Doc. 65-3 at 3.) Indeed, one member of the community filed a complaint with the City over Jones's post referring to Sheriff Rogers as a "clown," describing the post as "blatantly racist" and alleging its "wide[] circulat[ion]." (Doc. 59-10 at 7.) Jones's other posts on the killing of Tyre Nichols, "Straight Pride," former Assistant Health Secretary Levine, and blackface raised similar concerns by commenting on "hot-button political issues" like race, sexual orientation, and gender identity "in a mocking, derogatory, and disparaging manner." See MacRae v. Mattos, 106 F.4th 122, 137 (1st Cir. 2024). A public employee has a reduced First Amendment interest in speech of an "insulting and disparaging" nature. Id.; see Moser v. L.V. Metro. Police Dep't, 984 F.3d 900, 907 (9th Cir. 2021) (noting that "racially charged comments . . . arguably receive less First Amendment protection

28

under the Pickering balancing test for government employees" (citing Grutzmacher, 851 F.3d at 348)).

Indeed, less than one month after Jones's termination from the GFD, thirteen community members voiced their support for his termination at the Greensboro City Council's bimonthly meeting. (Doc. 62 at 12 (citing Meeting Agenda City Council).) Jones argues that this commentary is only "post-hoc political pressure" used by the City as a retroactive justification for his termination. (Doc. 63 at 20.) But the mere fact that Jones's termination generated such a reaction corroborates the City's reasonable apprehension over the deleterious effects of his posts. The City need not, despite Jones's suggestion to the contrary, wait until more fallout from his posts materialized to find that Jones's posts risked damage to its relationship with the public. Cf. Connick, 461 U.S. at 152 ("Furthermore, we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.").

Moreover, the Second, Sixth, and Ninth Circuits have all tempered any concerns related to an alleged heckler's veto in the context of the Pickering balancing test. See Bennett v. Metro. Gov't of Nash. & Davidson Cnty., 977 F.3d 530, 544 (6th Cir. 2020) ("Because effective emergency service 'presupposes respect for the members of [minority] communities,' such agencies are permitted to

29

account for the possible reaction of the public when disciplining their employees." (quoting Locurto, 447 F.3d at 182)); Dible v. City of Chandler, 515 F.3d 918, 928-29 (9th Cir. 2008) (noting that worries over a heckler's veto "do not directly relate to the wholly separate area of employee activities that affect the public's view of a governmental agency in a negative fashion, and, thereby, affect the agency's mission"); Locurto, 447 F.3d at 182 (holding that minority communities' negative reactions to the speech at issue "cannot properly be characterized as 'outsiders seeking to heckle [the plaintiffs] into silence'" (alteration in original) (quoting Melzer v. Bd. of Educ. of City Sch. Dist., 336 F.3d 185, 199 (2d Cir. 2003))). One district court in the Fourth Circuit has similarly rejected heckler's veto concerns where, as here, the public employee's speech "threatened internal employment . . . relations and operations." See Durstein v. Alexander, 629 F. Supp. 3d 408, 426 (S.D. W. Va. 2022); cf. Berger v. Battaglia, 779 F.2d 992, 1000-01 (4th Cir. 1985) (noting the "insidious threats" to First Amendment rights posed by the "heckler's veto" where there was "no suggestion of the kind of internal disruption" noted in the caselaw). The City therefore reasonably apprehended that Jones's conduct would "interfere[] with the operation" and "undermine[] the mission" of the GFD. See Ridpath, 447 F.3d at 317.

Finally, the GFD's paramilitary nature strengthens its

30

interest in policing Jones's disruptive and controversial speech. "Fire departments operate as 'paramilitary' organizations in which 'discipline is demanded, and freedom must be correspondingly denied.'" Grutzmacher, 851 F.3d at 347 (quoting Maciariello, 973 F.2d at 300). Courts therefore afford fire departments "greater latitude . . . in dealing with dissension in their ranks." Id. (alteration in original) (quoting Maciariello, 973 F.2d at 300). Jones is correct that this consideration is far from controlling. See id. But "it does further tip the scale" in the City's favor. Id.

By contrast, the interest in Jones's commentary on matters of public concern does not outweigh the significant governmental interests identified above. To be sure, a public safety official's interest in speaking on matters of public concern will outweigh even a compelling government interest "when, for example, the official's speech is 'grounded . . . in specialized knowledge [or] expresse[s] a general "concern about the inability of the [Department] to carry out its vital public mission effectively."'" Id. at 347-48 (alterations in original) (quoting Liverman, 844 F.3d at 410). This balancing comports with the fact "that public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers," City of San Diego v. Roe, 543 U.S. 77, 82 (2004) (per curiam), as "[g]overnment employees are often in the best position

31

to know what ails the agencies for which they work," <u>Liverman</u>, 844 F.3d at 408 (alteration in original) (quoting <u>Waters v. Churchill</u>, 511 U.S. 661, 674 (1994) (plurality opinion)).

But here, though Jones's firefighting experience may have given him some particular insight into the Guilford County Sheriff's Office or the dangers of riots and hoarding, his actual posts on these matters failed to demonstrate any specialized knowledge that would heighten the interest of his speech. Jones did not, for example, raise "[s]erious concerns regarding officer training and supervision" at the GFD, <u>see</u> <u>Liverman</u>, 844 F.3d at 410-11, nor did he note that GFD leadership "was overlooking violations of safety regulations," <u>see</u> <u>Goldstein</u>, 218 F.3d at 355; <u>cf.</u> <u>Templeton v. City of High Point</u>, No. 24cv671, 2026 WL 1759255, at *5 (M.D.N.C. June 18, 2026) (finding that the firefighter plaintiff had a clearly established right to speak on "the ability of the fire department to carry out its mission effectively" without suffering an adverse employment action). Rather, he described Sheriff Rogers as a "clown" and a "Freaking Joke" without further explanation,[12] and he queried whether cities would burn because of Tyre Nichols's death at the hands of Memphis police officers before asserting that "ALL LIVES MATTER." (See Docs. 59-

---

[12] Jones's post concerning Sheriff Rogers superficially touched on public safety. But beyond his identification of Sheriff Rogers as "the clown in charge of keeping you safe," his post is devoid of any particular knowledge or insight into how Sheriff Rogers might have posed a threat to public safety. (<u>See</u> Doc. 59-11.)

32

11, 59-13.)  In fact, the post most directly grounded in Jones's specialized knowledge also violated GFD policy by exposing the interior of a private residence.  (See Doc. 59-8.)  The court also need not find that the City's interest outweighed Jones's interest as to each individual post, and Jones makes no argument as to how his posts on sexual orientation, gender identity, or blackface – not to mention his post referring to any person offended by his commentary as a little bitch - were grounded in the specialized knowledge he obtained as a captain in the GFD.

To oppose the City's motion for summary judgment, Jones cites Moser, 984 F.3d at 911, where a divided panel of the United States Court of Appeals for the Ninth Circuit reversed the district court's grant of summary judgment in favor of the government employer.  In Moser, the plaintiff, who served as a member of the Las Vegas Metropolitan Police Department's special weapons and tactics unit, commented on a friend's social media post concerning the arrest of a man suspected of shooting another police officer: "Thanks to a Former Action Guy (FAG) and his team we caught that asshole . . . It's a shame he didn't have a few holes in him . . ." Moser, 984 F.3d at 902-03.  The Ninth Circuit held that a genuine dispute of material fact existed as to the "objective meaning" of the plaintiff's social media comment, yet the district court "appeared to accept" the employer's interpretation.  Id. at 907. This interpretation in favor of the moving party prevented the

33

district court from correctly determining "how much weight to give the government employee's First Amendment interests" and, as a result, how high to set the employer's burden in justifying the discharge.  Id. at 906.  The Ninth Circuit then held that the employer had not met its burden to demonstrate a "reasonable prediction of disruption," in part because the employer provided "no evidence that anyone other than the anonymous tipster even saw [the plaintiff's] Facebook comment."  Id. at 909-10.

Unlike the social media post in Moser, Jones's posts plainly do not "address[] problems at the government agency where" he worked even under his proffered meaning.  See id. at 906 (noting that commentary about such problems rests "[a]t the apex of the First Amendment").  Nor do Jones's posts meaningfully "touch[] on an important public policy issue that falls within his personal experience."  Id.  Indeed, even Chief Robinson expressed doubts on whether he, as chief, would "have an understanding of what the upper administration in the sheriff's department does."  (Doc. 59-2 at 26.)  As already noted, the City has also provided evidence well beyond the viewing of his Facebook posts by a single anonymous tipster of its reasonable apprehension of the disruption caused by Jones's speech.  Cf. Moser, 984 F.3d at 910.  And unlike the plaintiff in Moser, Jones made posts that the City reasonably believed to be insubordinate.  See Grutzmacher, 851 F.3d at 347.

Ultimately, the GFD has demonstrated that it reasonably

34

believed that its interest in efficiency and preventing disruption outweighed whatever public interest was present in Jones's social media activity. Though Jones seeks to frame this case as one where the City terminated his employment because he expressed a viewpoint contrary to what he contends is the City's preferred stance on matters of public interest, the record instead demonstrates that Jones repeatedly ignored the coaching efforts of his leadership and posted increasingly inflammatory material to his Facebook profile, which prominently identified him as a member of the GFD. These posts were largely unrelated to his experiences as a firefighter and created a reasonable apprehension of disruption to the efficiency of the GFD's operations. The court will thus grant the City's motion for summary judgment on Jones's First Amendment retaliation and North Carolina constitutional claims. Moreover, because the facts, when viewed in the light most favorable to Jones, indicate that the City is entitled to summary judgment on the Pickering/McVey balancing test, Jones's motion for summary judgment will correspondingly be denied.

### B.   Motion to Seal

"[T]he courts of this country recognize a general right to inspect and copy . . . judicial records and documents." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978). "The operations of the courts and the judicial conduct of judges are matters of utmost public concern," Landmark Commc'ns, Inc. v. Virginia, 435

35

U.S. 829, 839 (1978), "and the public's business is best done in public," Cochran v. Volvo Grp. N. Am., LLC, 931 F. Supp. 2d 725, 727 (M.D.N.C. 2013). "When parties 'call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials.'" Doe v. Pub. Citizen, 749 F.3d 246, 271 (4th Cir. 2014) (quoting Union Oil Co. of Cal. v. Leavell, 220 F.3d 562, 568 (7th Cir. 2000)).

The right of public access derives from both the common law and the First Amendment. See Va. Dep't of State Police v. Washington Post, 386 F.3d 567, 576 (4th Cir. 2004). "While the common law presumption in favor of access attaches to all 'judicial records and documents,' the First Amendment guarantee of access has been extended only to particular judicial records and documents." Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 178, 180 (4th Cir. 1988) (citation omitted) (quoting Nixon, 435 U.S. at 597). Thus, in any given case, some documents will "fall within the common law presumption of access," while others will be "subject to the greater right of access provided by the First Amendment," and some "may not qualify as 'judicial records' at all." United States v. Moussaoui, 65 F. App'x 881, 889 (4th Cir. 2003) (citing United States v. Amodeo, 44 F.3d 141, 145-46 (2d Cir. 1995)).

When a party makes a request to seal judicial records, a district court "must comply with certain substantive and

36

procedural requirements." Washington Post, 386 F.3d at 576. Procedurally, the court must (1) give the public notice and a reasonable opportunity to challenge the request to seal; (2) "consider less drastic alternatives to sealing"; and (3) if it decides to seal, make specific findings and state the reasons for its decision to seal over the alternatives. Id. "As to the substance, the district court first 'must determine the source of the right of access with respect to each document,' because '[o]nly then can it accurately weigh the competing interests at stake.'" Id. (alteration in original) (quoting Stone, 855 F.2d at 181). "Generally, the public interest in disclosure heightens as the underlying motions are directed more to the merits and as the case proceeds toward trial. SmartSky Networks, LLC v. Wireless Sys. Sols., LLC, 630 F. Supp. 3d 718, 732 (M.D.N.C. 2022). Pursuant to this court's Local Rules, "[n]o motion to seal will be granted without a sufficient showing by the party claiming confidentiality as to why sealing is necessary and why less drastic alternatives will not afford adequate protection, with evidentiary support." L.R. 5.4(c)(3).

Here, the City's motion to seal was filed by the same party claiming confidentiality. Specifically, the motion seeks to seal portions of both parties' briefs in support of their motions for summary judgment, their responses and replies, and their attached exhibits. According to the City, the relevant information includes

37

personnel records of current or former GFD employees (other than Jones), information derived from these records, and "otherwise sensitive personal information." (Doc. 71 at 2.) No one other than Jones has objected to or filed any opposition to the motion to seal.

The City argues that most of the material it seeks to seal falls within the purview of North Carolina General Statute § 160A-168. (Id. at 4.) Section 160A-168 provides that "all information contained in a city employee's personnel file," with some exceptions, "is confidential and shall be open to inspection" only in certain instances, such as "[b]y order of a court of competent jurisdiction." N.C. Gen. Stat. § 160A-168(c)(4). The City seeks to seal the remainder of the material because of the privacy concern for "sensitive personal information." (Doc. 71 at 5 (quoting Courthouse News Serv. v. Smith, 126 F.4th 899, 910 (4th Cir. 2025)).) This information includes the photograph of the interior of a private residence, posted by Jones to his Facebook page, and Chief Robinson's place of worship. (Id.) Further, in the event the court decides to unseal any document or portion of any document filed by the City, the City requests the opportunity to withdraw the document or strike the portion of the document. (Id. at 7.)

In response, Jones has objected to several of the City's requests for sealing. Jones contends that the City's redactions

38

are "overly broad and not narrowly tailored." (Doc. 72 at 3.) Specifically, Jones argues that Section 160A-168(b) permits disclosure of personnel records to the extent they relate to the "type of suspension taken for a disciplinary reason." (Id. at 4-5 (emphasis omitted) (citing § 160A-168(b)(11)).) Moreover, Jones asserts that portions of several fully sealed exhibits contain public social media posts of non-party GFD employees, who can have no expectation of privacy in the posts given their circulation on social media. (Id. at 5.) Finally, Jones contends that Section 160A-168 alone does not justify sealing, that the relevance of the City's response to non-party employees' social media posts warrants their unsealing, and that the City employs an overly broad interpretation of personnel records under the statute to conceal Jones's "disparate treatment argument" from the public. (Id. at 5-7.)

To begin, "the more rigorous First Amendment standard" applies "to documents filed in connection with a summary judgment motion in a civil case." Rushford v. New Yorker Mag., Inc., 846 F.2d 249, 253 (4th Cir. 1988). The court agrees that the photograph of the interior of a citizen's private residence and Chief Robinson's place of worship constitute "sensitive personal information," and safeguarding such information "is an important governmental interest." See Courthouse News Serv., 126 F.4th at 910. The same goes for Jones's date of birth and specific shift

and station information of non-party GFD employees.  Moreover, the parties have taken care to limit the opacity of documents with this information through targeted redactions.  See Fortson v. Garrison Prop. & Cas. Ins. Co., No. 19-CV-294, 2022 WL 824802, at *5 (M.D.N.C. Mar. 18, 2022) (noting that "[r]edaction is also the least drastic alternative to sealing" because it "maintain[s] a significant degree of transparency in the proceedings").  Thus, the court will seal docket entries 62, 62-1, 62-7, 63-5, 68-5, 69-5, and 70-5.  The court will also permit sealing of the redacted portions of page 4 of docket entry 62-2 and page 21 of docket entry 63-25, which similarly identify Chief Robinson's place of worship, and paragraph 8 of docket entry 62-16, which references a non-party employee's medical leave.

Further, the court agrees that the disclosure of the names of GFD personnel who previously complained of or were involved in alleged inappropriate relationships or sexual harassment incidents involving Jones would not serve the public interest.  A redacted, public version available at docket entry 66-8 omits the individuals' names but otherwise provides all the necessary context.  The court will protect the identities of these non-party individuals and therefore seal docket entry 69-8.  Cf. Alexander v. City of Greensboro, Nos. 09-CV-00293, 09-CV-00934, 2013 WL 6687248, at *5 (M.D.N.C. Dec. 18, 2013) ("Names of alleged sexual assault victims 'serve no useful public or investigative

40

purpose.'" (quoting <u>Wilmink v. Kanawha Cnty. Bd. of Educ.</u>, No. 03-0179, 2006 WL 456021, at *3 (S.D. W. Va. Feb. 23, 2006))).

The remaining exhibits, which largely deal with Facebook posts made by other GFD employees who received less severe punishments than Jones, present a closer call. On the one hand, the court agrees with Jones and will not seal documents that only reference the City's responses to this other controversial social media activity without identifying the individual personnel involved. The court also declines to seal records that merely provide the phone number and office address of Chief Robinson, or the name, email address, office address, and phone number of the City's law and compliance consultant, as this information appears readily available to the public on the City's website. <u>See</u> <u>Just. 360 v. Stirling</u>, 42 F.4th 450, 455 (4th Cir. 2022) (noting that courts "may properly take judicial notice of matters of public record" (quoting <u>Philips v. Pitt Cnty. Mem'l Hosp.</u>, 572 F.3d 176, 180 (4th Cir. 2009))); <u>see also</u> Fed. R. Evid. 201. Accordingly, the City's motion to seal will be denied regarding docket entries 62-6, 62-10, 63, 64-1, and 69, along with page 9 of docket entry 62-2 and pages 11 and 12 of docket entry 63-25. The court will not permit the City's withdrawal of any documents, or the striking of portions therein, because the First Amendment right attaches to the public's access to the documents "once the documents are '<u>filed</u> in connection with a summary judgment motion in a civil case.'"

41

See <u>United States ex rel. Oberg v. Nelnet, Inc.</u>, 105 F.4th 161, 172 (4th Cir. 2024) (quoting <u>Rushford</u>, 846 F.2d at 253).

On the other hand, the court finds that the actual personnel records of non-parties - which contain the complaints filed with the City, internal discussions between GFD leadership and the human resources department, copies of the social media posts at issue, and the discipline ultimately meted out – should largely remain sealed. Section 160A-168 provides "evidence of a strong public policy in North Carolina in favor of privacy with respect to particularly sensitive personnel . . . records." <u>Alexander</u>, 2013 WL 6687248, at *5. The court will not permit the sealing of all relevant docket entries in their entirety, however, because the government's public policy interest does not extend to the individuals' social media posts. Thus, while docket entries 63-15, 68-16, 69-1, and 70-7 will remain fully sealed, the court will require Jones to file new versions of docket entries 63-16, 63-17, 68-17, 68-18, 70-8, and 70-9 within seven days. These versions should provide the offending social media posts for public review to the greatest extent possible without disclosing the names or faces of the non-party GFD employees.

The remainder of the documents reside somewhere in between these two poles. Generally, the documents identify the individuals who were disciplined for their social media posts, and they include a description of both the offending post and the punishment

42

received.  However, most of these documents can easily be further redacted to protect the privacy of the individuals while also providing relevant context to the public.  Accordingly, as to docket entries 68, 69-2, and 70, the court will require the filing party to file a new redacted version within seven days that limits the redactions only to the names of the individuals who made the posts.  Docket entry 62-15 and paragraph 7 of docket entry 62-16 will remain sealed, however, due to the inability to preserve the non-party individuals' privacy with a more targeted redaction.

## III.  CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Plaintiff Jones's motion for summary judgment (Doc. 45) is DENIED, Defendant the City of Greensboro's motion for summary judgment (Doc. 46) is GRANTED, and this case is DISMISSED.

IT IS FURTHER ORDERED that the City's motion to seal (Doc. 71) is GRANTED IN PART and DENIED IN PART.  Docket entries 62, 62-1, 62-7, 62-15, 62-16, 63-5, 63-15, 68-5, 68-16, 69-1, 69-5, 69-8, 70-5, and 70-7 shall be SEALED.  Page 4 of docket entry 62-2 and page 21 of docket entry 63-25 shall also be SEALED.

The motion to seal is otherwise DENIED, and docket entries 62-6, 62-10, 63, 64-1, and 69 shall be UNSEALED.  Page 9 of docket entry 62-2 and pages 11 and 12 of docket entry 63-25 shall be UNSEALED, and within seven days Jones shall file new copies of

43

docket entries 62-2 and 63-25 containing only the redactions on page 4 and page 21, respectively.  Within seven days, the filing party shall file new redacted versions of docket entries 68, 69-2, and 70 that limit the redactions to the names of the individuals who made the posts.  And within seven days, Jones shall file new versions of docket entries 63-16, 63-17, 68-17, 68-18, 70-8, and 70-9 to provide only the relevant social media posts of the non-party GFD employees with all personally identifying information redacted.[13]  Upon the filing of these materials, the court will enter judgment.

                                 /s/   Thomas D. Schroeder
                              United States District Judge

August 10, 2026

---

[13] Because these docket entries represent three sets of the same two documents, Jones need only provide one set of new, redacted documents.